**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

LAUREN-GREY IGEL, on behalf of
herself and all others similarly situated,

      Plaintiff,                          Case No.  2:12-cv-00642

v.

CAMPUS APARTMENTS, LLC, *et al*.,

      Defendants.

_____/

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR CERTIFICATION OF A COLLECTIVE ACTION**

## I.     INTRODUCTION

This action is brought under 29 U.S.C. § 206(a) of the FLSA to collect unpaid minimum wages and damages for improper wage deductions from and/or credits taken against wages due to Igel and all others similarly situated.

This Motion is made pursuant to 29 U.S.C. § 216(b), which specifically provides that an action to recover for nonpayment of minimum wages may be maintained "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." An action brought on behalf of oneself and other employees similarly situated is known as a "Collective Action."

This case should be certified as a Collective Action because Igel is similarly situated to other aggrieved current and former employees of defendants.  Igel and other employees of defendants were victims of a common policy or plan that violated the law and there is a factual nexus between the harm Igel suffered and harm suffered by other employees of defendants.

1

Notice to other similarly situated current and former employees of defendants is appropriate such that those aggrieved may "opt-in" to this action. Because of the transient nature of those similarly situated to Igel, notice should be permitted via e-mail and Facebook.com, in addition to the more traditional methods of mailing and work-site posting.

## II.    BRIEF STATEMENT OF FACTS

Defendants, Campus Apartments, LLC, Campus Apartments Management, LLC, and Campus Apartments, Inc., conduct business under the trade name "Campus Apartments," and are collectively referred to as such in this Brief. Campus Apartments manages numerous apartment complexes across the nation that are marketed as college or university student housing. (Igel Affidavit ¶ 3). Campus Apartments utilizes a residence life program known as the "Keystone Program." (Igel ¶ 4). Oversight of the program and its terms and conditions is centralized by Campus Apartments and is handled by Heather Sizemore, National Director of Residence Life for Campus Apartments. (Igel ¶ 5). The Keystone Program is staffed by employees of Campus Apartments known as "Keystones." (Igel ¶ 7). Igel worked as a Keystone during her employment with Campus Apartments from August 1, 2011 through March 27, 2012. (Igel ¶¶ 1-2). The Keystone Program and its terms and conditions was a common policy and plan of Campus Apartments that was applied to Igel and all other Keystones. (Igel ¶ 8).

Campus Apartments provided Igel with "The Keystone's Guide to Residence Life" (the "Guide"); a 146-page document describing the Keystone Program. (Igel ¶ 9). One of the minimum requirements for the Keystone position is that the Keystone be a "[r]esident of Campus Apartments during employment" (the "Residency Requirement"). (Igel, Exhibit 1, p. 16).[1]

---

[1] The Guide and other Campus Apartments publications were published without page numbers. Page numbers have been printed on the documents for ease of reference.

Keystones are required to work approximately 20 hours per week and are "expected to establish a presence in their communities, including weekends," and may be required to be available during national holidays and school break periods.  (Igel, Exhibit 1, p. 16).

The duties and responsibilities of Keystones include, but are not limited to:

A.     marketing the property and leasing units (Igel, Exhibit 1, p. 13);

B.     building and maintaining relationships with current and future residents (Igel, Exhibit 1, p. 13);

C.     being the "go-to people at Campus Apartments communities" by being assigned a group of residents and establishing a relationship with those and other residents so that the Keystone can assist residents with issues like roommate disputes, homesickness, depression, eating disorders, alcohol abuse, drug use, suicidal tendencies, conduct problems, theft, accidents, and assaults (Igel, Exhibit 1, pp. 13, 20, 81-96);

D.     periodically working "on-call," during which time the Keystone is not permitted to leave the property and is required to be in uniform (Igel ¶ 11);

E.     participation in Campus Apartments conference calls with other Keystones across the nation (Igel, ¶ 6, Exhibit 1, p. 37);

F.     ensuring that the "property is a sociable, pleasurable, homelike environment," (Igel, Exhibit 1, p. 14); and

G.     working in the leasing office by performing tasks such as answering phones, logging package deliveries and distributing package notices, sorting and handling resident mail, assisting with copies and faxes, handling rent

payments, and preparing move-in and move-out packages.  (Igel, Exhibit 1, p. 15) (Igel ¶ 12).

As Sizemore stated in the cover letter to the Guide, Keystones are akin to college dormitory resident assistants: "[a]s a Keystone, you have joined the company of… resident assistants."  (Igel, Exhibit 1, p. 1).  Because Keystones are the "go-to people at Campus Apartments communities," their job duties arise at all hours of the day or night, as well as on weekends and holidays.  (Igel, Exhibit 1, p. 13).  "…[b]eing there for the residents is one of [the] main roles as a Keystone."  (Igel, Exhibit 1, p. 29).  It is not possible to perform the duties and responsibilities of a Keystone unless the Keystone resides on-site.  (Igel ¶ 23).  The Residency Requirement is for the primary benefit and convenience of Campus Apartments and is integral to the role and duties of the Keystones.

Campus Apartments makes the Residency Requirement clear in application packets available through its website, www.campusapts.com.  In a document named "Keystone_Application_Packet_without_Compensation.pdf," carrying the title "Keystone Application Packet 2009" (the "2009 Application"), Campus Apartments states that the Keystone is required to be a "[r]esident of Campus Apartments during employment."  (Exhibit A, p. 5).  In "University Gateway Keystone Application Packet 2011" (the "2011 Application"), Campus Apartments states that the Keystone is required to be a "[r]esident of Campus Apartments during employment."  (Exhibit B, p. 8).  In "Keystone Application Packet 2012" (the "2012 Application"), Campus Apartments reiterates that the Keystone is required to be a "[r]esident of Campus Apartments during employment."  (Exhibit C, p. 5).  As shown by the Guide, the 2009 Application, the 2011 Application, and the 2012 Application, at all times material, the Residency Requirement was in place for Keystones.

Campus Apartments employed and/or employs Keystones "all over the country." (Exhibit D). (Igel ¶ 13). Some of the states in which Campus Apartments employed or employs Keystones include, but are not limited to: Arizona, California, Colorado, Florida, Georgia, Kentucky, Louisiana, North Carolina, Pennsylvania, and Virginia. (Exhibits E through N, respectively). In fact, Campus Apartments employs so many Keystones in so many different places that it fosters the summer employment of Keystones at sites other than their normally assigned site through the Keystone Program, using a sub-program called "Keystone Exchange." (Exhibit O).

Campus Apartments describes the compensation to Keystones as follows:

> In monetary terms you will receive free rent and a monthly stipend for completion of your standard 20-hour per [sic] requirement. For any additional hours worked you will receive the state minimum hourly rate as appropriate to your location. In addition, if you are involved in the leasing of our properties you will receive the appropriate leasing bonus of any leases attributable to you in accordance with Campus Apartments' leasing bonus policy.

(Igel, Exhibit 1, p. 12). The compensation paid, or not paid to Keystones, was part of the Keystone Program and was a common policy or plan of Campus Apartments that was applied to Igel and all other Keystones. (Igel ¶ 15).

Campus Apartments failed to compensate Igel in compliance with the FLSA. Campus Apartments allegedly compensated Igel with "free rent" for workweeks in which Igel worked enough hours to qualify for such; twenty hours in a workweek. (Igel ¶ 17). Campus Apartments did not pay cash wages to Igel for all hours worked. (Igel ¶ 16).

Campus Apartments deducted from and/or took a "Rent Credit" against the wages to be paid to Igel for costs related to the Residency Requirement. (Igel ¶¶ 18-19, Exhibits 2 and 3). Regularly, these deductions and/or credits reduced the cash wages paid to Igel to less than the minimum wage due for the workweek or caused no cash wages to be paid for the workweek.

(Igel ¶¶ 20-21, Exhibits 2 and 3).  When Igel did not work at least the 20 hours per workweek that was required to cover the "Rent Credit," Igel was required to pay rent to Campus Apartments in an amount equal to the difference between the required 20 hours per workweek and the actual hours worked, at a rate of $7.25 per hour.  (Igel ¶ 25, Exhibit 4).

Igel was compensated under the common policy or plan of Campus Apartments known as the Keystone Program and the manner in which the policy or plan impacted her arises from the same circumstances under which other Keystones were impacted. (Igel ¶¶ 4, 5, 8, 15) (Exhibit A, p. 5; Exhibit B, p. 8; Exhibit C, p. 5; Exhibits E, F, H, I, L, M).

## III.   THIS CASE SHOULD BE CERTIFIED AS A COLLECTIVE ACTION PURSUANT TO 29 U.S.C. § 216(b)

### A. Legal Standards

The FLSA allows a plaintiff to bring suit on her own behalf or on behalf of other employees who are similarly situated. See 29 U.S.C. § 216(b).  Class certification under the FLSA requires: "(1) that the Plaintiffs in the class be 'similarly situated,' and (2) that the plaintiffs included in the class 'opt in' by filing with the Court their consent to the suit." Choimol v. FairfieldResorts, Inc., 475 F. Supp. 2d 557, 562 (E.D. Va. 2006).  The FLSA does not define the term "similarly situated" and the United States Court of Appeals for the Fourth Circuit has yet to articulate a standard for when persons are "similarly situated" under the FLSA.  Like many other federal district courts, the Eastern District of Virginia has utilized a two step analysis when analyzing whether persons are "similarly situated" and granting certification of the action as a Collective Action.  Choimol, 475 F. Supp. 2d at 562.  The court will first handle the "notice stage" and determine whether initial notice of the action is to be provided to potential class members.  "[T]his determination is made using a fairly lenient standard," because minimal evidence is available at this point in the proceeding. Id. (citations omitted).  "[C]ourts appear to

6

require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan infected by discrimination."   Sperling v. Hoffmann-La Roche, Inc., 118 F.R.D. 392 (D.N.J. 1988), aff'd in part**,** 862 F.2d 439, 444 (3rd Cir. 1988), aff'd, 493 U.S. 165 (1989).   If conditional certification is granted and the defendant files a motion to decertify, the case will proceed to a second step.   Houston et. al. v. URSCorp. et al., 591 F. Supp. 2d 827, 832 (E.D. Va. 2008).   In that second step, if the Court determines the plaintiffs are similarly situated, the case proceeds to trial.   Id. Otherwise, the class is decertified and the original plaintiff(s) proceed individually.   Id.

 In handling the notice stage, "[b]ecause the statute of limitations continues to run on unnamed class members' claims until they opt into the collective action... courts have concluded that the objectives to be served through a collective action justify the conditional certification of a class of putative plaintiffs early in a proceeding, typically before any significant discovery, upon an initial showing that the members of the class are similarly situated."   Houston, 591 F. Supp. 2d. at 831.

In determining whether persons are similarly situated "[t]here must be sufficient reason to believe that there are issues common to the proposed class that are central to the disposition of the FLSA claims and that such common issues can be substantially adjudicated without consideration of facts unique or particularized as to each class member." Id.   In Houston case, the Court went on to state:

> That is not to say that there can be no differences among class members or that an individualized inquiry may not be necessary in connection with fashioning the specific relief or damages to be awarded to each class member. Rather, the inquiry is whether the presence of common issues allows the class-wide claims to be addressed without becoming bogged down by individual differences among class members. In this regard, courts have observed that the requirements for class certification of a collective

> action under FLSA are similar, but not identical, to those that
> pertain to certification of a class under Fed. R. Civ. P. 23.

Id.

Accordingly, the questions to be addressed at the notice stage are whether there are (1) issues common to the proposed class that are (2) central to the disposition of the FLSA claims and (3) whether these common issues can be substantially adjudicated without considering facts unique to each class member.

**B. Discussion**

Igel respectfully requests that this Court certify the following opt-in class:

> All persons who worked for Campus Apartments as a "Keystone"
> at any time during the three years prior to the filing of the
> Complaint in this matter.

This Motion is supported by the Affidavit of Lauren-Grey Igel and publications authored by Campus Apartments or its agents or employees, or adopted by Campus Apartments. Igel and the other Keystones present issues common to the proposed class that are central to the disposition of the FLSA claims and that can be substantially adjudicated without consideration of facts unique or particularized as to each class member. The issues presented in this case are (1) whether the Residency Requirement was for the primary benefit and convenience of Campus Apartments and (2) whether deductions from or taking of credits for "free rent" against wages owed to Keystones violated the FLSA.

**1. Whether the Residency Requirement was for the Primary Benefit and Convenience of Campus Apartments**

The issue of whether the Residency Requirement was for the primary benefit and convenience of Campus Apartments is an issue common to the proposed class that is central to the disposition of the FLSA claims that can be substantially adjudicated without consideration of facts unique or particularized as to each class member. The FLSA defines wages as follows:

"'Wages paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging or other facilities are customarily furnished by such employer to his employees." 29 U.S.C. § 203(m).  Accordingly, it is possible for the cost of lodging to be credited against wages owed to an employee.  However, "[t]he [FLSA] regulations state that facilities furnished primarily for the benefit or convenience of the employer should not be included in computing wages…"  Masters v. Maryland Management Co., 493 F.2d 1329, 1334 (4th Cir. 1974).  See also Bailey v. Pilots' Asso. for Bay & River Delaware, 406 F. Supp. 1302, 1309 (E.D. Pa. 1976).  Thus, if the Residency Requirement was for the primary benefit or convenience of Campus Apartments, the costs related to the provision of the lodging, or "free rent," cannot be deducted from or credited towards minimum wages owed.  The answer to this central question will determine whether Campus Apartments is liable for unpaid minimum wages to the members of the proposed class.

This issue is common to the proposed class because the Residency Requirement was part of a single decision, policy or plan administered by Campus Apartments through the Keystone Program. As shown by the Guide, the 2009 Application, the 2011 Application, and the 2012 Application, at all times material, the Residency Requirement was in place for Keystones.  (Igel, Exhibit 1, p. 16) (Exhibit A, p. 5; Exhibit B, p. 8; Exhibit C, p. 5) (Igel ¶ 24).

It does not appear a specific method has been prescribed for determining whether the provision of a facility such as lodging is for the primary benefit or convenience of the employer.  Some Courts have utilized a "balancing of the benefits test" that is inferred under 29 C.F.R. § 531.3(d)(1).  See for example Soler v. G. & U., Inc., 833 F.2d 1104 (2nd Cir. 1987), cert. denied, 488 U.S. 832 (1988) and Salazar-Martinez v. Fowler Bros., 781 F. Supp. 2d 183

(W.D.N.Y. 2011). "The balancing of benefits test in the regulation weighs the relative benefit to the employer and the employee of any given item, using a case-by-case, 'common sense and logical' approach." Salazar-Martinez, 781 F. Supp. 2d at 191, citing Soler, 833 F. 2d at 1109. Because the benefits accruing to Campus Apartments and to each of the members of the proposed class all arise under the commonly and centrally administered Keystone Program, the issue of whether the Residency Requirement was for the primary benefit or convenience of Campus Apartments is an issue common to the proposed class that is central to the disposition of the FLSA claims that can be substantially adjudicated without consideration of facts unique or particularized as to each class member.

    **a.  Issue Common to the Proposed Class**

The benefits accruing to Campus Apartments are common throughout the proposed class and can be seen by and through the job duties performed by the members of the proposed class that are related to the Residency Requirement.  Campus Apartments received the benefits of these job duties, which are outlined in the Guide (Igel ¶ 10), and include:

    A.    building and maintaining relationships with current and future residents (Igel, Exhibit 1, p. 13);

    B.    being the "go-to people at Campus Apartments communities" by being assigned a group of residents and establishing a relationship with those and other residents so that the Keystone can assist residents with issues like roommate disputes, homesickness, depression, eating disorders, alcohol abuse, drug use, suicidal tendencies, conduct problems, theft, accidents, and assaults (Igel, Exhibit 1, pp. 13, 20, 81-96); and

      C.     ensuring that the "property is a sociable, pleasurable, homelike environment"

            (Igel, Exhibit 1, p. 14).

The "benefits," if any, accruing to the members of the proposed class are also common throughout the proposed class, as the "benefits" allegedly conferred on each member was "free rent" and residency at the work-site.  This is shown by the Guide's statement that members of the proposed class "will receive free rent" and "will receive private or shared accommodations depending on the community's configuration."  (Igel, Exhibit 1, pp. 12, 17).  Further evidence of the common application of the compensation scheme to and "benefits" allegedly conferred on the members of the proposed class include advertisements for Keystone positions in Tucson, Arizona (Exhibit E), Los Angeles, California (Exhibit F), Tampa, Florida (Exhibit H), Columbus, Georgia (Exhibit I), Greenville, North Carolina (Exhibit L), and Lancaster, Pennsylvania (Exhibit M). However, "[s]pecial circumstances may exist where lodging is of little benefit to an employee, such as when an employer requires an employee to live on-site to meet a particular need of the employer or when an employee is required to be "on call" at the employer's behest."  Soler, 833 F.2d at 1109-10 (citation omitted).

Although, any "benefits" that may have been conferred on members of the proposed class were common throughout the class, no "benefit" was ever actually provided by Campus Apartments.  Keystones suffered wage deductions from their paychecks that went to pay rent to Campus Apartments for the very residence that was a job requirement.  Further, when Keystones did not work enough hours to cover the wage deduction for rent, Keystones were required to pay the difference to Campus Apartments.  Because rent was deducted from wages due or paid out of pocket by the Keystones, the "free rent" and residency at the work-site was never really provided by Campus Apartments and could not be a "benefit" to the members of the proposed class.  This

case is akin to <u>Masters</u>, where the Court of Appeals for the Fourth Circuit upheld a district court's decision that "lodging on the premises was found as a fact to be for the benefit of the employer and **the apartment was not furnished by the employer since [the employee] paid rent of $215 a month, and he was required to live on the property**." 493 F.2d at 1334 (emphasis added). Like in <u>Masters</u>, the "free rent" is not furnished by Campus Apartments since the Keystones paid rent or had rent payments deducted from their wages due, and the Keystones are required to live on the property.

Further proof that the benefit of "free rent" and residency at the work-site was never conferred by Campus Apartments is Igel's Form W-2 Wage and Tax Statement (the "W-2"), provided by Campus Apartments. (Igel ¶ 26, Exhibit 5). IRC § 119 (a)(2) provides: "[t]here shall be excluded from gross income of an employee the value of any meals or lodging furnished to him, his spouse, or any of his dependents by or on behalf of his employer for the convenience of the employer, but only if in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment." As the W-2 states that Igel received only $213.00 in "wages, tips and other compensation," Campus Apartments has stated that the "free rent" was primarily for the benefit of Campus Apartments or that the "free rent" was not paid to Igel as "wages, tips, or other compensation." In either case, Campus Apartments has violated the FLSA. Either Campus Apartments took an improper credit for lodging that was provided for Campus Apartments' convenience, or Campus Apartments never paid Igel and other Keystones the "free rent" as compensation.

Because the benefits accruing to Campus Apartments and the "benefits," if any, accruing to each of the members of the proposed class all arise under the commonly and centrally administered Keystone Program, the issue of whether the Residency Requirement was for the

primary benefit and convenience of Campus Apartments is an issue common to the members of the proposed class.

### b. Issue Central to the Disposition

The issue of whether the Residency Requirement was for the primary benefit and convenience of Campus Apartments is central to the disposition of this case. "[F]acilities furnished primarily for the benefit or convenience of the employer should not be included in computing wages…" Masters, 493 F.2d at 1334. Thus, if the Residency Requirement was for the primary benefit or convenience of Campus Apartments, the costs related to the provision of the lodging, or "free rent," cannot be deducted from or credited towards minimum wages owed. In that event, the members of the proposed class would be entitled to damages for unpaid minimum wages for each workweek deductions or credits reduced the wages paid to less than minimum wage or caused no wages to be paid.

### c. Substantial Adjudication Without Consideration of Unique Facts

The issue of whether the Residency Requirement was for the primary benefit and convenience of Campus Apartments can be substantially adjudicated without consideration of facts unique or particularized as to each class member. Campus Apartments manages the terms and conditions of the Keystone Program through a centralized program, thus maintaining consistency of the key elements of this case: the Residency Requirement, the roles and duties of the members of the proposed class, and the compensation scheme for each member. (Igel ¶¶ 4-12, 15, Exhibit 1) (Exhibits A-C, E, F, H, I, L, M). Although the amount of damages owed to any individual class member may differ from that of another, whether Campus Apartments is liable for unpaid minimum wages is a question that can be addressed by examining the Keystone

Program and does not require consideration of facts unique or particularized to each class member.

**2. Whether Deductions From or Taking of Credits for "Free Rent" Against Wages Owed to Members of the Proposed Class Violated the FLSA**

Whether deductions from or taking of credits for "free rent" against wages owed to Keystones violated the FLSA is an issue common to the proposed class that is central to the disposition of the FLSA claims and that can be substantially adjudicated without consideration of facts unique or particularized as to each class member. In this case, Keystones received a "Rent Credit" instead of cash wages. (Igel ¶¶ 15, 18, Exhibit 2). This "Rent Credit" acted as a deduction from the wages owed to Keystones and/or acted as a credit to Campus Apartments for "free rent" against the wages owed to Keystones. (Igel ¶¶ 18-19, Exhibits 2, 3). Although this issue tracks many of the same arguments and issues as the preceding question, this issue also presents the possibility that the deductions from or taking credits for "free rent" against wages owed constitutes an illegal "kickback."

29 C.F.R. § 531.35 provides:

> "Free and clear" payment; "kickbacks." Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act.

In this case, the deduction from or taking credits for "free rent" against wages owed is an illegal "kickback" because it constitutes the Keystone purchasing from Campus Apartments an item "specifically required for the performance of the employer's particular work": the on-site apartment.   "This rule prohibits any arrangement that 'tend[s] to shift part of the employer's business expense to the employees… to the extent that it reduce[s] an employee's wage below the statutory minimum.'"   Ramos-Barrientos v. Bland, 661 F.3d 587, 594-95 (11th Cir. 2011) (quoting Mayhue's Super Liquor Stores, Inc. v. Hodgson, 464 F.2d 1196, 1199 (5th Cir. 1972), cert. denied, 409 U.S. 1108 (1973)) (alteration in original)); Shultz v. Hinojosa, 432 F.2d 259, 267 (5th Cir. 1970).   The deductions from or taking credits for "free rent" against wages owed, shifts to the Keystones part of Campus Apartments' business expenses related to the job-created necessity of on-site housing.   Accordingly, Campus Apartments' deductions from or taking credits for "free rent" against wages owed constitutes illegal "kickbacks."

As shown by the exhibits previously cited and through the previous discussion, Keystones were the victims of a single decision, policy, or plan that directed how Keystones were to be compensated. (Igel ¶ 4-9, 15, Exhibit 1, pp. 12, 17); (Exhibits A-C, E, F, H, I, L, M). Because the compensation scheme for Keystones was dictated by the commonly and centrally administered Keystone Program, the members of the proposed class all present this common issue.   If the compensation scheme violates the FLSA and/or constitutes a "kickback," it is central to the disposition of the FLSA claims and would result in damages being owed to Keystones for improper wage deductions or credits taken that, in a workweek, resulted in the payment of wages at a rate less than that of minimum wage or the payment of no wages. Because the Residency Requirement and compensation scheme is part of the commonly and

centrally administered Keystone Program, the issue can be substantially adjudicated without consideration of facts unique or particularized as to each class member.

### 3. Conclusion – Certification is Appropriate

The foregoing discussion clearly establishes that this is an appropriate case for certification and Court facilitated notice. The proposed class members have all been victims of a common policy or plan that was centrally administered by Campus Apartments. The proposed class is narrowly tailored to encompass only those persons similarly situated to Igel, but also encompasses numerous people that live in various states across the country, thus furthering judicial efficiency by allowing those persons to adjudicate their claims within the context of a Collective Action. There is sufficient evidence to establish that the pertinent issues are common to the proposed class and central to the disposition of the FLSA claims, and that the issues can be substantially adjudicated without consideration of facts unique or particularized as to each class member. Because of the commonality of facts and law presented by the proposed class, certifying this case as a Collective Action would further the remedial purposes of the FLSA and further judicial efficiency.

## IV.    FACILITATION OF NOTICE AND NOTICE PLAN

Having demonstrated that the proposed class members are similarly situated and that certification is appropriate, Igel requests that this Court facilitate Notice to the proposed class members. This Court has discretion to "facilitate this notice by allowing discovery of the names and addresses of potential plaintiffs, by authorizing a notice for plaintiffs counsel to send to potential plaintiffs, or by some other appropriate action." Choimol, 475 F. Supp. 2d at 563 (quoting DeAsencio v. Tyson Foods, Inc., 130 F. Supp. 2d 660, 663 (E.D. Pa. 2001)); Houston, 591 F. Supp. 2d. at 832. "This discretion is not unfettered; the court must assess 'whether this is

an appropriate case in which to exercise [its] discretion.'" Houston, 591 F. Supp. 2d. at 832

(citing Camper v. Home Quality Management Inc., 200 F.R.D. 516, 519 (D. Md. 2000))

(alteration in original).   Because Campus Apartments provides management services to

approximately 70 college and university markets and employs numerous Keystones at each site,

there are numerous members of the proposed class, thus meriting this Court's facilitation of

notice.  The limited information available to Igel regarding the other members of the proposed

class also merits the Court's facilitation of notice.

Igel submits the following notice plan, which is tailored to the worker population at issue.

**A.  Proposed Notice**

Igel requests the Court approve the attached proposed Notice of Opportunity to Join a

Lawsuit to Recover Wages, to be signed by the Court.  (Exhibit R).

**B.  Production of Contact Information**

Igel requests that the Court order Campus Apartments to produce, within fifteen days of

this Court's Order, a list, in both printed and electronic format, of all current and former

Keystones that have worked at any Campus Apartments location in the three years preceding the

date of the Order.  This list should include for each Keystone:

1.  first, middle, and last name;

2.  first 5 digits of the social security number;

3.  all telephone numbers on record;

4.  all e-mail addresses on record;

5.  last known address;

6.  address of any parent/guardian and/or of any guarantor for any lease with Campus
    Apartments;  and

17

7. the name, city, and state of the community or complex where the Keystone was employed.

It is reasonably anticipated that the proposed class will be largely comprised of young adults between the ages of 18 and 25.  These persons are likely to be enrolled in college or be recently graduated.  Persons in this age group and demographic are likely to have moved from the address last known by Campus Apartments.  Accordingly, e-mail addresses, as well as addresses of any parent, guardian, and/or guarantor, are requested so that notice can be provided via various means and through methods allowing maximal, but fair, opportunities for notice to reach the members of the proposed class.  The provision of e-mail addresses and the use of e-mail for facilitating notice to an FLSA, opt-in class has been approved in the Eastern District of Virginia.  See Gregory v. Belfor USA Group, Inc., 2012 U.S. Dist. LEXIS 104573 (E.D. Va. July 26, 2012)("…email addresses, and phone numbers are to be used and distributed only for effecting notice of this litigation.")

C. Methods

In this case, notice should be had via the following methods:  posting at the workplace, traditional mail, e-mail, and Facebook.com.

With respect to posting at the workplace, Igel requests that the Court order Campus Apartments to post of copy of the approved Notice in each location where Keystones are employed or perform work.  This practice has been described as "routinely approved."  Garcia et al. v. Pancho Villa's of Huntington Village, Inc., et al., 678 F. Supp. 2d 89, 96 (E.D.N.Y. 2010) (citations omitted).  The Notice should be in a conspicuous place for all Keystones to see, and should remain posted throughout the pendency of the opt-in period.

Traditional U.S. mail has long been the standard method of providing notice in FLSA collective actions. Igel's counsel will handle the mailing of the Notice and will collect and file all Consent to Join Collective Action forms received from persons with claims against Defendants.

With respect to e-mail, as cited herein, the Eastern District of Virginia has allowed the provision of notice through e-mail. <u>Gregory</u>, 2012 U.S. Dist. LEXIS 104573. E-mail is a common form of communication and should be allowed in this case. Further, the members of the proposed class are reasonably anticipated to be comprised of an age group and demographic that has a high level of comfort and use of electronic communication such as e-mail.

With respect to notice via Facebook.com, Campus Apartments maintains a robust social media presence on Facebook.com and utilizes Facebook.com to accept rent payments from residents, receive requests for maintenance, and connect with its residents and employees. Referring to residents of Campus Apartments, which, because of the Residency Requirement, includes Keystones, Campus Apartments has stated, "[e]verything they do is online. They pay rent online, they do service requests for facilities online…" (Exhibit P). Campus Apartments has also stated, "Nearly all our residents and many of their parents are on Facebook throughout the day…" (Exhibit Q). It should also be noted that Campus Apartments advertises openings for Keystone positions on its various pages at Facebook.com. (Exhibits H, I).

As Campus Apartments recognizes the importance of Facebook.com as a method of communication with its residents, Keystones, and potential Keystones, this Court should authorize the facilitation of notice via Facebook and allow Igel's Counsel to provide notice of this action to members of the proposed class via Facebook.com and order that Campus Apartments conspicuously post on all of its Facebook.com sites a copy of the Notice. The

posting by Campus Apartments should state: "If you worked as a Keystone, you may be eligible to receive back wages that were not paid to you."   The Notice should provide a link to Adobe PDF versions of the Notice and Consent to Join Collective Action.   Because subsequent posts by Campus Apartments and other visitors and users of the site will force this post lower on the page and reduce its visibility, Igel respectfully requests that this Court order that the statement, Notice and Consent to Join Collective Action be posted by Campus Apartments to each of its Facebook pages within ten days of this Court's Order and that a repeat post be made fifteen days thereafter. Because Campus Apartments recognizes Facebook.com as a "critical communications tool," this Court should Order that notice be provided via Facebook.com as outlined herein.  (Exhibit Q).

### D.  Opt-In Period

Igel requests that this Court set the opt-in period at ninety (90) days from the date of U.S. mailing (a date to be certified by Igel's counsel).  Because many members of the proposed class are likely to have moved residence from the last known address held by Campus Apartments, it is likely that receipt of the Notice could be negatively impacted by mail forwarding and/or mail returned undeliverable.  Alternative, electronic means are proposed in order to provide maximal, but fair opportunities for notice.  A proposed Consent to Join Collective Action form is attached hereto and Igel respectfully requests that this Court approve the form. (Exhibit S).

## V.    CONCLUSION

Based on the foregoing, Igel respectfully requests that the relief prayed for in her Motion for Certification of a Collective Action be granted by this Court.


**LAUREN-GREY IGEL**

By: _____/s/_____
Joshua M. David (VSB No. 41386)
jdavid@davidkampfrank.com

Nicholas A. Nunes (VSB No. 77947)
nanunes@davidkampfrank.com
Attorneys for Lauren-Grey Igel
DAVID, KAMP & FRANK, L.L.C.
739 Thimble Shoals Blvd., Suite 105
Newport News, VA  23606
(757) 595-4500 (Phone)
(757) 595-6723 (Facsimile)

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 7th day of January, 2013, I will electronically file the foregoing with the Clerk of Court using the CM/ECF System, which will then send notification of such filing (NEF) to the following:

C. Michael DeCamps, Esq.
Karen S. Elliot, Esq.
SANDS ANDERSON PC
Bank of America Center
1111 East Main Street, Suite 2400
Richmond, VA 23129
mdecamps@sandsanderson.com
kelliot@sandsanderson.com


Charles A. Ercole, Esq.
Lee D. Moylan, Esq.
KLEHR HARRISON HARVEY
BRANZBURG, LLP
1835 Market Street, 14th Floor
Philadelphia, PA 19103
cercole@klehr.com
lmoylan@klehr.com


By: _____/s/_____
Joshua M. David (VSB No. 41386)
jdavid@davidkampfrank.com
Nicholas A. Nunes (VSB No. 77947)
nanunes@davidkampfrank.com
Attorneys for Lauren-Grey Igel
DAVID, KAMP & FRANK, L.L.C.
739 Thimble Shoals Blvd., Suite 105
Newport News, VA  23606
(757) 595-4500 (Phone)
(757) 595-6723 (Facsimile)